## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ROBERTO MEDINA, derivatively on behalf of
REGENXBIO INC.,

c/o Timothy Brown Esq.
The Brown Law Firm, P.C.
767 Third Avenue,
Suite 2501
New York, NY 10017

     *Plaintiff*,

      v.

REGENXBIO INC.,
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

     *Nominal Defendant*,

and

KENNETH T. MILLS
c/o REGENXBIO Inc.,
9804 Medical Center Drive
Rockville, MD 20850

and

CURRAN SIMPSON
c/o REGENXBIO Inc.,
9804 Medical Center Drive
Rockville, MD 20850

and

STEPHEN PAKOLA
c/o REGENXBIO Inc.,
9804 Medical Center Drive
Rockville, MD 20850

and

Case No. 8:26-cv-01080

**DEMAND FOR JURY TRIAL**

JEAN BENNETT
c/o REGENXBIO Inc.,
9804 Medical Center Drive
Rockville, MD 20850

and

ALLAN FOX
c/o REGENXBIO Inc.,
9804 Medical Center Drive
Rockville, MD 20850

and

ALEXANDRA GLUCKSMANN
c/o REGENXBIO Inc.,
9804 Medical Center Drive
Rockville, MD 20850

and

A.N. KARABELAS
c/o REGENXBIO Inc.,
9804 Medical Center Drive
Rockville, MD 20850

and

GEORGE MIGAUSKY
c/o REGENXBIO Inc.,
9804 Medical Center Drive
Rockville, MD 20850

and

DAVID STUMP
c/o REGENXBIO Inc.,
9804 Medical Center Drive
Rockville, MD 20850

and

DANIEL TASSÉ
c/o REGENXBIO Inc.,
9804 Medical Center Drive
Rockville, MD 20850

and

JENNIFER ZACHARY
c/o REGENXBIO Inc.,
9804 Medical Center Drive
Rockville, MD 20850

     *Defendants*.

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Roberto Medina ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant REGENXBIO Inc. ("REGENXBIO" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Kenneth T. Mills ("Mills"), Curran Simpson ("Simpson"), Stephen Pakola ("Pakola"), Jean Bennett ("Bennett"), Allan Fox ("Fox"), Alexandra Glucksmann ("Glucksmann"), A.N. Karabelas ("Karabelas"), George Migausky ("Migausky"), David Stump ("Stump"), Daniel Tassé ("Tassé"), and Jennifer Zachary ("Zachary") (collectively, the "Individual Defendants," and together with REGENXBIO, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of REGENXBIO, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Mills, Simpson, and Pakola for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding REGENXBIO, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff

3

believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 9, 2022, through January 27, 2026, both dates inclusive (the "Relevant Period").

2. REGENXBIO is a Delaware corporation headquartered in Rockville, Maryland, chiefly engaged in the development of gene therapies designed to address and treat genetic defects.

3. Leading up to and throughout the Relevant Period, the Company had initiated and continued its Phase I/II clinical trial for the development of its product candidate RGX-111 (the "RGX-111 Phase I/II Trial"). RGX-111 is a single-dose gene therapy for the treatment of Mucopolysaccharidosis Type I ("MPS I").

4. Throughout the Relevant Period, the Individual Defendants issued statements to the investing public that overstated the potential success of the RGX-111 Phase I/II Trial and the safety and efficacy of its product candidate, RGX-111.

5. The truth began to emerge on January 28, 2026, when the Company announced, through a press release, that the United States Food and Drug Administration ("FDA") placed a clinical hold on its product candidate RGX-111. Contrary to the Individual Defendants' statements throughout the Relevant Period touting the safety of RGX-111, the press release revealed that an intraventricular central nervous system ("CNS") tumor was found in a participant of the RGX-111 Phase I/II Trial.

6. On this news, the price of the Company's common stock dropped $2.40, or about 17.8%, from a closing price of $13.41 per share on January 28, 2026, to a closing price of $11.01

per share on January 29, 2026.

7.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*: (1) the safety risks associated with the RGX-111 Phase I/II Trial were higher than originally stated; (2) that the interim results of the RGX-111 Phase I/II Trial were insufficient to maintain the FDA's Fast Track designation that was granted to RGX-111 in 2018; and (3) the clinical and commercial prospects of RGX-111 and the Individual Defendants' characterization of RGX-111 as one of the Company's lead clinical-stage AAV therapeutic product candidates were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8.      Moreover, four of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, netting combined total proceeds of approximately $7.7 million.

9.      The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

10.      The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duties. In light of the Individual Defendants' misconduct—which has subjected the Company, its current President and Chief

5

Executive Officer ("CEO"), its former President and CEO, and its Executive Vice President ("EVP") and Chief Medical Officer ("CMO"), to a federal securities fraud class action pending in the United States District Court for the District of Maryland (the "Securities Class Action"). This has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted form the wrongdoing alleged herein—the Company will have to expend millions of dollars.

11.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Mills', Simpson's, and Pakola's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

6

Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

17. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

18. Plaintiff is a current shareholder of REGENXBIO. Plaintiff has continuously owned Company common stock since first purchasing the stock on December 9, 2020.

### Nominal Defendant REGENXBIO

19. REGENXBIO is a Delaware corporation with its principal executive offices located at 9804 Medical Center Drive, Rockville, Maryland, 20850. REGENXBIO's common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "RGNX."

### Defendant Mills

20.     Defendant Mills has served a Company director since March 2009 and as Chairman of the Board since July 2024. Prior to his appointment as Chairman of the Board, Defendant Mills served as the Company's CEO and President from September 2015 to July 2024.

21.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mills made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| December 19, 2023 | 45,000 | $19.69 | $885,825 |
| January 16, 2024 | 45,000 | $15.18 | $682,992 |
| February 14, 2024 | 4,652 | $16.47 | $76,626 |
| February 14, 2024 | 10,348 | $16.89 | $174,723 |
| March 14, 2024 | 15,000 | $21.86 | $327,942 |
| April 15, 2024 | 15,000 | $18.19 | $272,871 |
| May 14, 2024 | 15,000 | $15.82 | $237,222 |
| July 16, 2024 | 200 | $13.76 | $2,752 |
| July 17, 2024 | 2,210 | $13.77 | $30,440 |
| July 24, 2024 | 12,221 | $13.78 | $168,433 |
| July 25, 2024 | 15,369 | $13.96 | $214,501 |
| January 27, 2026 | 221,753 | $13.41 | $2,973,708 |

Thus, in total, before the fraud was exposed, he sold 401,753 shares of Company common stock on inside information, for which he received approximately $6 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

22.     The Schedule 14A the Company filed with the SEC on April 8, 2025 (the "2025 Proxy Statement") stated the following about Defendant Mills:

*Kenneth T. Mills* has been a Director since March 2009, and served as our President and Chief Executive Officer until July 2024 when he was appointed Chairman of the Board. Mr. Mills was appointed as President, Chief Executive Officer, and Director of Tagworks Pharmaceuticals BV, a privately-held precision oncology company, in July 2024. Mr. Mills was with FOXKISER LLP ("FOXKISER"), most recently as a Partner, from January 2007 to January 2015 and was previously the

Chief Financial Officer and Vice President of Business Development at Meso Scale Diagnostics, a life sciences company, from January 2004 to December 2006 and was part of the original management team that established the company's operations and financing strategy. From March 1997 to December 2003, Mr. Mills was employed at IGEN International, Inc., a biotechnology company, where he served as Director of Business Development up through the company's acquisition by Roche. Mr. Mills received an S.B. in Chemistry from the Massachusetts Institute of Technology. Mr. Mills' qualifications to continue to serve as a member of the Board include his extensive experience as an executive in the gene therapy and biotechnology industries, including as former President and Chief Executive Officer of our Company, his prior service as a senior-level executive in both early stage and mature biotechnology companies and his demonstrated business judgment.

**Defendant Simpson**

23.    Defendant Simpson has served as the Company's President and CEO and as a Company director since July 2024. Prior to this, Defendant Simpson served as the Company's EVP and Chief Operating Officer ("COO") from August 2015 until his appointment as President and CEO in July 2024.

24.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Simpson made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| July 29, 2024 | 9,648 | $15.04 | $145,105.92 |
| August 1, 2024 | 100 | $15.00 | $1,500 |
| October 9, 2025 | 20,811 | $12.62 | $262,634.82 |

Thus, in total, before the fraud was exposed, he sold 30,559 shares of Company common stock on inside information, for which he received approximately $409,241 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

25.    The 2025 Proxy Statement stated the following about Defendant Simpson:

*Curran Simpson* became Company President, Chief Executive Officer and

Director in July 2024. Mr. Simpson previously served as our EVP, Chief Operating Officer and has been on our senior management team since August 2015. Prior to joining us, from December 2012 until August 2015, Mr. Simpson was the Regional Supply Chain Head for North America and Interim Chief Operating Officer at GlaxoSmithKline plc ("GSK"). Mr. Simpson was the Senior Vice President, Operations at the Human Genome Sciences division of GSK ("HGS") from July 2006 to December 2012, as well as the Vice President, Manufacturing Operations at HGS from January 2003 to June 2006 and served as interim CEO of HGS, where he led the integration of HGS into GSK. Prior to HGS, Mr. Simpson held various positions with Biogen, Inc., Covance Biotechnology Services Inc., Novo-Nordisk Biochem Inc., Genentech, Inc. and Genencor, Inc. Mr. Simpson is a member of the Board of Directors of the Alliance for Regenerative Medicine, an international advocacy organization for cell therapies and genetic medicines. Mr. Simpson received an M.S. in Surface and Colloid Science (Physical Chemistry) from Clarkson University and a B.S. in Chemistry/Chemical Engineering from Clarkson College of Technology. Mr. Simpson's qualifications to serve as a member of the Board include his extensive experience as an executive in the biotechnology and life sciences industries, including as former EVP, Chief Operating Officer of our Company along with his prior service as a senior-level executive with biotechnology companies and his demonstrated business judgment.

**Defendant Pakola**

26. Defendant Pakola has served as the Company's EVP and CMO since April 2019.

27. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Pakola made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| January 3, 2023 | 3,138 | $22.17 | $69,569 |
| January 3, 2024 | 17,237 | $17.39 | $299,789 |
| March 5, 2024 | 12,878 | $28.36 | $365,22 |

Thus, in total, before the fraud was exposed, he sold 33,253 shares of Company common stock on inside information, for which he received approximately $734,579 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

28. The 2025 Proxy Statement stated the following about Defendant Pakola, in

10

relevant part:

> **Steve Pakola, M.D.,** age 56, is currently our EVP, Chief Medical Officer and has been our Chief Medical Officer since April 2019. Prior to joining us, Dr. Pakola served as Chief Medical Officer of Aerpio Pharmaceuticals, Inc. from October 2015 until April 2019. From April 2012 until October 2015, Dr. Pakola was the Chief Medical Officer of Amakem NV, a biopharmaceutical company. Prior to Amakem, from May 2000 until April 2012, Dr. Pakola was the Chief Medical Officer of ThromboGenics NV, a biopharmaceutical company, where he was the lead inventor and program lead for the Jetrea (ocriplasmin) program. Dr. Pakola received an M.D. and a B.A. in Biology, each from the University of Pennsylvania.

## Defendant Bennett

29.     Defendant Bennett has served as a Company director since September 2021 and serves as a member of the Compensation Committee.

30.     The 2025 Proxy Statement stated the following about Defendant Bennett:

> **Jean Bennett, M.D., Ph.D.,** has been a Director since September 2021. Dr. Bennett has been the F.M. Kirby Emeritus Professor of Ophthalmology at the Perelman School of Medicine at the University of Pennsylvania since July 2021, where she was previously a professor for 17 years. She also served as director of the Center for Advanced Retinal and Ocular Therapeutics at the University of Pennsylvania from July 2014 to June 2023. In addition to Dr. Bennett's positions at the University of Pennsylvania, she has been an Investigator at the Center for Cellular and Molecular Therapeutics at The Children's Hospital of Philadelphia for more than a decade. She also co-founded life science companies Spark Therapeutics (acquired by Roche), GenSight Biologics, Limelight Bio and Opus Genetics. Dr. Bennett has published or contributed to more than 175 peer-reviewed publications on gene therapy, including her pioneering work on gene therapy delivery of RPE65, which was foundational to the approval of Luxturna, the first gene therapy product approved by the U.S. Food and Drug Administration (the "FDA"). Dr. Bennett received a B.S. in Biology from Yale University, a Ph.D. in Zoology and Cell Biology from the University of California, Berkeley and an M.D. from Harvard University. She also completed postdoctoral fellowships in Radiobiology and Environmental Health at the University of California, San Francisco, Human Genetics at Yale School of Medicine and Development Genetics at The Johns Hopkins University School of Medicine. She is a member of the National Academy of Science, The National Academy of Medicine and the American Academy of Arts and Sciences. Dr. Bennett's work as a leading molecular genetics researcher and her past experience in drug development, provides her with deep medical and scientific experience and with life sciences expertise, particularly in the field of retinal gene therapy.

11

**Defendant Fox**

31.     Defendant Fox has served as a Company director since February 2009. He previously served as the Chairman of the Board from June 2020 to June 2024. Moreover, Defendant Fox is the founding partner of FOXKISER, a firm that engaged in the advancement of innovation in biomedical research through the formation and development of ventures in the public and private sectors. Through his role in FOXKISER, Defendant Fox participated in the founding of REGENXBIO.

32.     The 2025 Proxy Statement stated the following about Defendant Fox:

*Allan M. Fox* has been a Director since February 2009 and served as Chairman from June 2020 until June 2024. Mr. Fox is the founding partner of FOXKISER, a firm committed to the strategic development of transformative innovations from biomedical research, which was formed in September 1986. Mr. Fox specializes in identifying business opportunities and improving competitive market positions. Through FOXKISER, he has participated in the formation and development of numerous ventures in the public and private sectors, including the founding of REGENXBIO and Dimension Therapeutics, Inc. Before forming FOXKISER, Mr. Fox co-led the establishment of the Washington office of the law firm of Kaye Scholer. While in the public sector, Mr. Fox served as Chief of Staff and Chief Legislative Assistant to U.S. Senator Jacob K. Javits of New York. He also served as Chief Counsel to the United States Senate Health and Scientific Research Subcommittee, chaired by Senator Edward M. Kennedy. Mr. Fox was a Fellow in Law, Science and Medicine at Yale Law School where he received an LL.M. degree. Mr. Fox also holds a J.D. and B.A. from Temple University. Mr. Fox has specific attributes that qualify him to continue to serve as a member of the Board, including his broad experience in providing strategic advice to and investing in biotechnology companies throughout their life cycles, his expertise in identifying business opportunities, his deep experience with REGENXBIO since the time of its founding and his current and prior service on boards of directors.

**Defendant Glucksmann**

33.     Defendant Glucksmann has served as a Company director since May 2018 and serves on the Compensation Committee.

34.     The 2025 Proxy Statement stated the following about Defendant Glucksmann:

*Alexandra Glucksmann, Ph.D.,* has been a Director since May 2018. Dr. Glucksmann currently serves as President and CEO of Sensorium Therapeutics, a privately held biotechnology company, as a Senior Advisor at Scenic Biotech BV, a privately held biotechnology company, and on the Supervisory Board of TME Pharma NV, a biotechnology company focused on the treatment of aggressive cancers. From April 2018 to November 2022, Dr. Glucksmann served as the President and Chief Executive Officer and a director at Cedilla Therapeutics, Inc., a privately held biotechnology company, and from October 2017 to March 2018, Dr. Glucksmann was an Entrepreneur-in-Residence at Third Rock Ventures, LLC, a privately held healthcare venture firm, where she focused on company formation. She was also a founding employee of Editas Medicine, Inc., a publicly held biotechnology company, and served as its Chief Operating Officer from October 2013 to March 2017. Prior to that, Dr. Glucksmann was a founding employee of Cerulean Pharma Inc., a publicly held biotechnology company, and served as its Senior Vice President of research and business operations from September 2006 to June 2013. From August 2006 to May 2015, she served as a director at Taconic Biosciences, Inc. Dr. Glucksmann received a B.S. in Bacteriology from the University of Wisconsin-Madison and a Ph.D. in Molecular Genetics and Cell Biology from the University of Chicago, and she completed her postdoctoral fellowship at the Massachusetts Institute of Technology. Dr. Glucksmann's qualifications to continue to serve as a member of the Board include her extensive experience in senior management positions at biotechnology companies, particularly her experience in the formation and development of biotechnology companies.

### Defendant Karabelas

35.     Defendant Karabelas has served as a Company director since May 2015 and serves on the Compensation Committee. Moreover, Defendant Karabelas previously serves as the Company's Lead Independent Director from June 2020 until June 2024.

36.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Karabelas made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| July 1, 2024 | 10,000 | $11.27 | $112,691 |
| July 29, 2024 | 11,000 | $15.05 | $165,495 |
| August 1, 2024 | 9,600 | $13.45 | $129,120 |
| August 1, 2024 | 400 | $14.59 | $5,834 |
| August 1, 2024 | 100 | $15.00 | $1,500 |
| September 3, 2024 | 9,300 | $11.50 | $106,950 |

| September 3, 2024 | 700 | $12.34 | $8,638 |

Thus, in total, before the fraud was exposed, he sold 41,100 shares of Company common stock on inside information, for which he received approximately $530,228 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

37.     The 2025 Proxy Statement stated the following about Defendant Karabelas:

***A.N. "Jerry" Karabelas, Ph.D.**,* has been a Director since May 2015 and served as Lead Independent Director from June 2020 until June 2024. Dr. Karabelas has been a Venture Partner at Apple Tree Partners, a life sciences venture capital firm, since January 2021, prior to which he was a Partner at Care Capital, LLC ("Care Capital"), a life sciences venture capital firm, from December 2001 to December 2020. Before joining Care Capital, Dr. Karabelas was Chairman at Novartis BioVentures Fund, which is owned by Novartis AG ("Novartis"), a provider of capital for life sciences companies across the biotech, medical devices and diagnostics industries, prior to which he was the Chief Executive Officer of Novartis Pharma AG, which is also owned by Novartis. Before joining Novartis, Dr. Karabelas was Executive Vice President, Worldwide Pharmaceuticals of SmithKline Beecham, where he was responsible for U.S. and European operations, regulatory and strategic marketing. Dr. Karabelas also serves as a director at Braeburn Pharmaceuticals, Inc., a privately held pharmaceutical company, since September 2015. He previously served as director at Bausch Health Companies from 2016 until 2023, Chairman at Polyphor AG, a pharmaceutical company, from June 2013 to November 2019 and Inotek Pharmaceuticals Corporation from July 2012 to June 2016. In connection with his work at Care Capital, Dr. Karabelas previously served on numerous boards of directors of pharmaceutical and therapeutics companies, including Renovo, plc, Vanda Pharmaceuticals, Inc. and NitroMed, Inc. Dr. Karabelas also previously served as Chairman at SkyePharma, plc and Human Genome Sciences. Dr. Karabelas received a B.S. from the University of New Hampshire and a Ph.D. from the Massachusetts College of Pharmacy. Dr. Karabelas's senior management positions at commercial and development-stage biopharmaceutical companies, strong knowledge of strategic and regulatory issues, his insight into international operations and his international perspective on the life sciences industry and healthcare related issues provides him with deep executive leadership, medical, life sciences, regulatory, international and commercial expertise.

**Defendant Migausky**

38.     Defendant Migausky has served as a Company director since September 2021. He

also serves as the Chair of the Audit Committee.

39.    The 2025 Proxy Statement stated the following about Defendant Migausky:

*George Migausky* has been a Director since September 2021. Mr. Migausky has more than 30 years of experience in the life sciences industry, having served as Chief Financial Officer for several public biopharmaceutical and clinical diagnostic companies. From April 2017 to September 2017, Mr. Migausky served as interim Chief Financial Officer for Ocular Therapeutix, Inc., a biopharmaceutical company. Prior to that, he served as Chief Financial Officer of Dyax Corp., a biopharmaceutical company, from August 2008 through the company's acquisition by Shire plc in January 2016. Prior to that, Mr. Migausky served as Chief Financial Officer of Wellstat Management Company, a biotechnology company, from 2007 to 2008, and Chief Financial Officer of IGEN International, Inc., a biotechnology company, and BioVeris Corporation, a diagnostics company, from 1986 through their acquisitions by F. Hoffman LaRoche in 2004 and 2007, respectively. Mr. Migausky has served as a director at Immunovant, Inc., a publicly held biopharmaceutical company, since December 2019. He has also served as a trustee at the Massachusetts Eye and Ear Institute since 2015. Mr. Migausky previously served as a director at Dimension Therapeutics, Inc. from June 2015 through the company's acquisition by Ultragenyx Pharmaceutical Inc. in November 2017, and at Abeona Therapeutics Inc. from June 2020 to September 2020 and at Hyperion Catalysis International, a privately held electrical manufacturing company, from 2008 to August 2022. He received a B.S. from Boston College and an M.B.A. from Babson College. Mr. Migausky has specific attributes that qualify him to continue to serve as a member of the Board, including his significant experience in executive leadership positions in the life sciences industry and serving on the boards of directors and audit committees of publicly traded biopharmaceutical companies.

**Defendant Stump**

40.    Defendant Stump has served as a Company director since October 2015. He also serves on the Audit Committee and as Chair of the Nominating and Corporate Governance Committee.

41.    The 2025 Proxy Statement stated the following about Defendant Stump:

*David C. Stump, M.D.,* has been a Director since October 2015. From November 1999 to December 2012, Dr. Stump was with Human Genome Sciences, Inc., a biopharmaceutical company, as Executive Vice President, Research and Development from May 2007 to December 2012, Executive Vice President, Drug Development from December 2003 to May 2007 and Senior Vice President, Drug Development from November 1999 to December 2003. Prior to joining Human Genome Sciences, Dr. Stump held roles of increasing responsibility at Genentech, Inc., a biopharmaceutical company, from 1989 to 1999, including Vice President,

Clinical Research and Genentech Fellow. Prior to joining Genentech, Dr. Stump was an Associate Professor of Medicine and Biochemistry at the University of Vermont. Dr. Stump has served as a director at MacroGenics, Inc., a publicly held biopharmaceutical company, since September 2013. He also currently serves on the board of trustees of Earlham College. Dr. Stump previously served as a director at Sunesis Pharmaceuticals, Inc. from June 2006 to February 2021, Portola Pharmaceuticals, Inc. from September 2015 to July 2020 and Dendreon Corporation, a biotechnology company, from June 2010 to June 2015. Dr. Stump holds an A.B. from Earlham College and an M.D. from Indiana University and completed his residency and fellowship training in internal medicine, hematology, oncology and biochemistry at the University of Iowa. Dr. Stump has specific attributes that qualify him to continue to serve as a member of the Board, including his substantial medical and scientific background and expertise, his extensive experience in research and development and operations in the biotechnology industry and his prior service on public company boards.

**Defendant Tassé**

42.     Defendant Tassé has served as a Company Director since August 2016 and as Lead Independent Director since July 2024.

43.     The 2025 Proxy Statement stated the following about Defendant Tassé:

***Daniel Tassé*** has been a Director since August 2016 and began serving as Lead Independent Director in July 2024. Mr. Tassé has served as the Chief Executive Officer and a director of DBV Technologies SA, a publicly held biopharmaceutical company, since November 2018. From March 2016 to March 2019, he was the Chairman of Alcresta Therapeutics, Inc. ("Alcresta"), a privately held biopharmaceutical company, and from March 2016 to November 2018, he was the Chairman and Chief Executive Officer of Alcresta. Mr. Tassé previously served as a director at Indivior PLC, from August 2014 to May 2021, Bellerophon Therapeutics, Inc. from December 2013 to May 2019 and HLS Therapeutics Inc. from March 2018 to March 2019. Prior to the acquisition of Ikaria Inc. ("Ikaria") by Mallinckrodt Pharmaceuticals in April 2015, Mr. Tassé was President, Chief Executive Officer and Chairman of Ikaria and served as the Interim Chief Executive Officer and President of Bellerophon from February 2014 to June 2014. Previously, Mr. Tassé was the General Manager of the Pharmaceuticals and Technologies Business Unit of Baxter International, Inc. and Vice President and Regional Director for Australasia at GlaxoSmithKline plc. Mr. Tassé was a member of the Health Section Governing Board of the Biotechnology Industry Organization, where he participated on the bioethics, regulatory environment and reimbursement committees. Additionally, Mr. Tassé was a member of the board of directors of the Pharmaceutical Research and Manufacturers of America, where he participated on the FDA and biomedical research committee. Mr. Tassé received a B.Sc. in Biochemistry from the University of Montreal. Mr. Tassé has an extensive track

record of business building in the healthcare industry, a strong background in commercial operations, global management experience and a detailed knowledge of the life sciences industry, which provides him with a breadth of executive leadership, life sciences and international experience.

**Defendant Zachary**

44.     Defendant Zachary has served as a Company Director since June 2022. She also serves on the Audit Committee.

45.     The 2025 Proxy Statement stated the following about Defendant Zachary:

*Jennifer Zachary* has been a Director since June 2022. Ms. Zachary currently serves as the Executive Vice President and General Counsel of Merck & Co., Inc. In this role, she serves as a legal advisor to Merck's directors and executives, leads the company's office of general counsel and sets the company's global legal strategy. She is also responsible for the company's compliance, global safety and environment, and global security functions. Prior to joining Merck, Ms. Zachary was a partner at the international law firm Covington & Burling, LLP. She practiced in the area of pharmaceutical and medical device regulatory law and advised a wide range of manufacturers and trade associations on compliance with government requirements for the development, manufacture and sale of their products. Prior to that, Ms. Zachary served as an Associate Chief Counsel for enforcement at the FDA and as a Special Assistant U.S. Attorney in the Civil Division of the U.S. Attorney's Office for the District of Columbia. Ms. Zachary holds a B.S./B.A. in biology and chemistry from Arizona State University and a J.D. from Harvard Law School. Ms. Zachary has specific attributes that qualify her to continue to serve as a member of the Board, including her government service related to health care and regulatory compliance, experience in senior management positions at a large biopharmaceutical company and a global law firm, and her strong knowledge of strategic, legal and regulatory issues.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

46.     By reason of their positions as officers, directors, and/or fiduciaries of REGENXBIO and because of their ability to control the business and corporate affairs of REGENXBIO, the Individual Defendants owed REGENXBIO and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage REGENXBIO in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of

REGENXBIO and its shareholders so as to benefit all shareholders equally.

47.     Each director and officer of the Company owes to REGENXBIO and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

48.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of REGENXBIO, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

49.     To discharge their duties, the officers and directors of REGENXBIO were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

50.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of REGENXBIO, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised a majority of REGENXBIO's Board at all relevant times.

51.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

52.     To discharge their duties, the officers and directors of REGENXBIO were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of REGENXBIO were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Maryland, and the United States, and pursuant to REGENXBIO's corporate governance and applicable codes of conduct and/or ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how REGENXBIO conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of REGENXBIO and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that REGENXBIO's operations would comply with all applicable laws and REGENXBIO's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

53.     Each of the Individual Defendants further owed to REGENXBIO and the shareholders the duty of loyalty requiring that each favor REGENXBIO's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

54. At all times relevant hereto, the Individual Defendants were the agents of each other and of REGENXBIO and were at all times acting within the course and scope of such agency.

55. Because of their advisory, executive, managerial, directorial, and controlling positions with REGENXBIO, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

56. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by REGENXBIO.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

57. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

59. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal

21

material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of REGENXBIO was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of REGENXBIO and was at all times acting within the course and scope of such agency.

## REGENXBIO'S CODE OF BUSINESS CONDUCT AND ETHICS

62.     REGENXBIO's Code of Business Conduct and Ethics ("Code of Conduct"), under the heading "Our Code's Purpose" states the following about its scope:

WHAT IS OUR CODE?

Our Code covers a wide range of business practices and procedures.  It does not cover every issue that may arise, but it sets out basic principles to guide all directors, officers, and employees of REGENXBIO and its subsidiaries. We also expect our agents and representatives, including consultants, to observe our Code's standards when conducting business with and for REGENXBIO.

WHO IS COVERED?

Our Code covers a wide range of business practices and procedures. It does not cover every issue that may arise, but it sets out basic principles to guide all directors, officers, and employees of REGENXBIO and its subsidiaries. We also expect our agents and representatives, including consultants, to observe our Code's standards when conducting business with and for REGENXBIO.

WHAT ARE THE EXPECTATIONS?

We expect everyone to read this Code, act accordingly, and seek to avoid even the appearance of improper behavior. If you violate the standards in our Code, you may be subject to disciplinary action, up to and including immediate termination of employment. Nothing in our Code modifies our at-will employment relationship, which may only be modified in an express written agreement signed by the employee and REGENXBIO's Chief Executive Officer or Chief Legal Officer.

63.     Under the same heading, the Code of Conduct also elaborates on its purpose, stating the following:

Our Code seeks to deter wrongdoing and to promote:

• honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

•  full, fair, accurate, timely and understandable disclosure in reports and documents that we file with the Securities and Exchange Commission (SEC) and in other public communications;

• compliance with applicable laws, rules and regulations;

• prompt internal reporting of Code violations to appropriate personnel; and

• accountability for ethical conduct.

64.     Under the heading "Marketplace Standards," in a subsection titled "Making Good Decisions: Laws and Regulations," the Code of Conduct states the following in relevant part:

We are committed to continuously reviewing and updating our policies and procedures to always ensure best practices and adherence to the ethics of our industry. Therefore, our Code may be modified in the future and you will be notified of any significant modifications.

In addition, we interact with healthcare professionals and organizations on many levels, through our clinical trials and consulting arrangements. We will comply with all laws that regulate our interactions with healthcare professionals and

23

organizations.

65.    Under the heading "Marketplace Standards," in a subsection titled "Public

Disclosure of Information," the Code of Conduct states the following:

REGENXBIO is required to disclose certain information in various reports filed
with or submitted to the SEC. In addition, from time to time, REGENXBIO makes
other public communications, such as issuing press releases or public presentations.
No employee, officer or director may make any such public disclosure without
obtaining the required company approvals. REGENXBIO expects all directors,
officers and employees who are involved in the preparation of SEC reports or other
public documents to ensure that the information disclosed in those documents is
full, fair, accurate, timely and understandable

If you ever believe that questionable accounting or auditing conduct or practices
have occurred or are occurring, report those concerns to our Chief Executive
Officer or Chief Legal Officer or in accordance with our Whistleblower Policy,
which is available as part of our internal employee resources.  .

66.    Under the heading titled "Marketplace Standards," under the subsection "Conflicts

of Interest," the Code of Conduct states the following, in relevant part:

Conflicts of interest are prohibited. In rare instances, a conflict of interest waiver
may be granted to an employee by our Chief Executive Officer, Chief Financial
Officer or Chief Legal Officer. A director, executive officer or member of our
executive team may be granted a waiver with the written consent of the Board of
Directors.

67.    Under the heading "Marketplace Standards," in the subsection titled "Insider

Trading" the Code of Conduct states the following in relevant part:

Securities laws and insider trading violations are taken very seriously. It is
extremely important that you understand the general rules and standards
surrounding securities transactions, which are summarized here and further
explained in our Insider Trading Policy.

All non-public information about REGENXBIO should be considered confidential,
and you are not permitted  to use or share confidential information  for securities
trading purposes or any  other purpose, except the conduct of  our business.
                                    ***
Material non-public information could affect the market price of the company's
securities if it were to be made public, and using such information to profit from
trading would violate insider trading laws and our Insider Trading Policy. Under
no circumstances may you trade on REGENXBIO's securities  or any  of our

24

business partners' securities as a result of such information or share such information with anyone outside of REGENXBIO.

Violating insider trading laws or our Insider Trading Policy would not only be unethical but also illegal. Any such violation could result in criminal prosecution, a civil enforcement action and termination of employment.

68. Under the heading "Marketplace Standards," in a subsection titled "Prevention of

Corruption" the Code of Conduct states the following, in relevant part:

REGENXBIO prohibits bribery and corruption in any form, anywhere in the world. Our employees, directors, officers and contractors do not offer or accept bribes from anyone. The U.S. Foreign Corrupt Practices Act prohibits giving anything of value, directly or indirectly, to officials of foreign governments or foreign political candidates in order to obtain or retain business. It is strictly prohibited to make illegal payments to government officials of any country. Entering into any business arrangement with government officials, including for consulting or spokesperson work, requires prior review by our Chief Legal Officer.

\*\*\*

In addition, the U.S. government has many laws and regulations regarding business gratuities that may be accepted by U.S. government personnel. Promising, offering or giving a gift, favor or other gratuity to an official or employee of the U.S. government would not only violate this Code, but could also be a criminal offense. State and local governments, as well as foreign governments, may have similar rules.

All REGENXBIO employees are trained on our anti-bribery and anti-corruption policies that are described in our Code. Compliance with our anti-bribery and anti-corruption policies is monitored at all levels of the company, including by REGENXBIO's Board of Directors and senior management. Our Chief Financial Officer or Chief Legal Officer can provide guidance if you have any questions or concerns about whether a certain action could be considered bribery or corruption.

69. Under the heading "Reporting Standards," and under the subsection titled

"Reporting Illegal or Unethical Behavior" the Code of Conduct states the following:

You are strongly encouraged to promptly talk to our Chief Executive Officer, Chief Financial Officer or Chief Legal Officer about observed illegal or unethical behavior, including any violations of our Code, or when in doubt about the best course of action in a particular situation. REGENXBIO does not allow retaliation for reports of misconduct by others made in good faith by employees. You are expected to cooperate in any internal investigation of potential misconduct.

Under REGENXBIO's Whistleblower Policy, which is available as part of our

internal employee resources, you may, on an anonymous basis, submit a goodfaith concern regarding observed illegal or unethical behavior or questionable accounting or auditing matters without fear of dismissal or retaliation of any kind. To submit an anonymous report, call our whistleblower hotline at (855) 735-3002 or make a report online at www.regenxbio.ethicspoint.com.

70.    Under the heading "Waivers of Our Code," the Code of Conduct states the following:

Waivers of our Code may only be granted by our Chief Executive Officer, Chief Financial Officer or Chief Legal Officer; provided, however, that any waiver of our Code for executive officers or directors may be granted only by our Board of Directors or the Audit Committee pursuant to the Board's delegation. Any such waiver of our Code for executive officers or directors, and the reasons for such waiver, will be disclosed publicly by REGENXBIO, as required by applicable laws or regulations.

71.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

### REGENXBIO'S AUDIT COMMITTEE CHARTER

72.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purposes of the Audit Committee are the following:

The purpose of the Committee shall be to assist the Board in fulfilling its oversight responsibilities relating to the Company's financial accounting, internal controls, reporting and compliance. The Committee's principal functions are to serve as an

26

independent and objective monitor of:

- The quality and integrity of the Company's financial statements, accounting principles, financial reporting and related disclosures;

- The effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting;

- The Company's compliance with legal and regulatory requirements and internal policies regarding ethical conduct; and

- The selection of the independent auditors and the independent auditor's objectivity, qualifications, independence and performance.

73.    The Audit Committee Charter, under the heading "Responsibility and Authority," states the following regarding the Audit Committee's responsibility over oversight of financial disclosures and internal controls:

1. Reviewing periodically, with the Company's management and independent auditors, the Company's financial reporting processes and disclosure controls and procedures, including the Company's policies and procedures designed to provide assurance that information required to be disclosed in its periodic public reports is accurately reported within the time periods specified by the SEC;

2. Reviewing periodically, with the Company's management and independent auditors, the adequacy and effectiveness of the Company's internal control over financial reporting designed to protect assets and provide assurance that transactions are properly authorized, executed, recorded and summarized in the Company's books and records. As part of this responsibility, at least annually, the Committee shall meet with management to review its plan for the maintenance, modification, enhancement and testing of such controls for the ensuing fiscal year;

3. Reviewing the reports prepared by management and the independent auditors assessing the adequacy and effectiveness of the Company's internal control over financial reporting, prior to the inclusion of such reports in the Company's periodic filings as required under the rules of the SEC. The Committee's review shall also focus on whether there are any significant deficiencies in, any significant changes to, or material weaknesses in such controls reported by management or the independent auditors, management's plans to remediate any identified significant deficiencies or material weaknesses and the progress of any such plans, or comments and management's responses contained in any accompanying management letter; and

4. To exercise oversight of the internal audit function, including reviewing, at least annually, the need for, and desirability of, implementing an internal audit department within the Company. In this capacity, the Committee will have the primary authority to define the structure, staffing, activities and reporting relationships of such internal audit function.

74. The Audit Committee Charter, under the same heading, states the following regarding the Audit Committee's responsibility over the Company's financial reporting and other disclosures:

15. Reviewing with management and the Company's independent auditors, before filing or release (as applicable):

• the Company's Annual Report on Form 10-K, including the audited financial statements and Management's Discussion and Analysis ("MD&A");

• the Company's Quarterly Reports on Form 10-Q, including the unaudited interim financial statements and MD&A;

• the Company's earnings announcements or financial releases and earnings guidance;

• any other material financial information incorporated in the Company's regulatory filings, including but not limited to registration statements to be filed under the Securities Act of 1933, as amended;

• the Company's disclosure of non-GAAP financial measures, whether in its filings with the SEC filings or otherwise; and

• any required certification or attestations of management.

16. Overseeing compliance with the disclosure requirements of the SEC regarding auditors' services and audit committee members, member qualifications and activities; and

17. Preparing any report required to be prepared by it for inclusion in the proxy statement of the Company under SEC rules and regulations.

75. Under the heading "Responsibilities and Authority," the Audit Committee Charter states the following regarding the Audit Committee's responsibilities relating to risk management,

28

related party transactions and other responsibilities:

18. Reviewing and periodically discussing guidelines and policies governing the process by which management and other persons responsible for risk management assess and manage the Company's exposure to major financial risk and the steps management has taken to monitor and control such exposures, based on consultation with the Company's management, independent auditors and counsel;

19. Establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

20. Reviewing and approving all related party transactions in accordance with the applicable rules of the Exchange and the SEC and any related policies and procedures adopted by or on behalf of the Company and then in effect;

21. Reviewing, approving and monitoring compliance with the Code of Business Conduct and Ethics for the Company in accordance with the applicable rules of the Exchange and the SEC, including any waivers of the Code of Business Conduct and Ethics for any directors and officers;

22. Discussing with management and the independent auditors any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies;

***

25. Reporting regularly to the full Board, including with respect to any issues that arise with respect to the quality or integrity of the Company's financial statements, the effectiveness of the Company's internal controls or disclosure procedures, the performance and independence of the Company's independent auditors, or any other issue that the Committee believes should be brought to the attention of the full Board. Such reports may be made orally or in writing;

26. Performing such other duties as may be necessary or desirable to comply with the applicable laws, rules and regulations promulgated by the SEC, the Exchange or any other applicable governmental agency, if such duties are customarily assigned to the audit committee, or requested by the Board; and

27. Reviewing and overseeing the Company's cash management, investment activities and tax planning and compliance, and approving policies related to these matters, if any.

76. In violation of the Audit Committee Charter, the Individual Defendants (as key

29

officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, ensure that the Company's financial states complied with GAAP, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

77.     REGENXBIO is a Delaware corporation headquartered in Rockville, Maryland. The Company is engaged in the development of gene therapies to address and treat genetic defects and diseases.

78.     The Company's investigational gene therapies introduce functional genes that are intended to support the production of proteins and/or antibodies that target disease. Specifically, Company's gene therapies use adeno-associated virus ("AAV") vectors from its proprietary gene delivery platform, NAV Technology Platform ("NAV") to deliver its gene therapies.

79.     One of the Company's investigational gene therapies is its product candidate, RGX-111—a single dose treatment for MPS I. In this regard, leading up to and during the Relevant Period, the Company initiated and continued its RGX-111 Phase I/II Trial which evaluated the safety and tolerability of RGX-111. Additionally, the RGX-111 Phase I/II Trial

also evaluated RGX-111's mechanism of action and its effects on the study participants with MPS I.

80.    As the RGX-111 Phase I/II Trial continued and throughout the Relevant Period, the Individual Defendants created a false impression surrounding the success of the trial and the safety of RGX-111 as a treatment for MPS I.

**False and Misleading Statements**

***February 9, 2022 Press Release***

81.    The Relevant Period began on February 9, 2022, when the Company issued a press release (the "February 2022 Press Release") which announced positive initial data in the RGX-111 Phase I/II Trial. Specifically, the February 2022 press release notes the following results:

- RGX-111, a potential one-time gene therapy for MPS I, is well-tolerated across two dose levels, with no drug-related serious adverse events

- Biomarker and neurodevelopmental assessments indicate encouraging CNS profile in patients dosed with RGX-111

- Evidence of systemic biomarker activity observed

- Phase I/II trial data are consistent with positive results from an RGX-111 single-patient IND

- Completed dosing of three patients in Cohort 2; Cohort 2 has been expanded to enroll up to 6 additional patients

82.    The February 2022 Press Release also quotes Defendant Pakola's enthusiastic comments about RGX-111's potential efficacy and the trajectory of the Phase I/II trial. In particular, Defendant Pakola is quoted as saying:

This marks our first data presentation from the Phase I/II trial evaluating RGX-111 as a potential one-time gene therapy delivered directly to the central nervous system (CNS) for the treatment of severe MPS I. We are encouraged to see that RGX-111 has been well-tolerated with emerging evidence of CNS biomarker activity and improvements in neurodevelopmental function, which suggest biological activity in the CNS following one-time administration of RGX-111. We also saw emerging

evidence of biomarker activity outside of the CNS. We plan to enroll additional patients in the Phase I/II trial and look forward to providing additional updates.

***February 24, 2023 Press Release***

83.     On February 24, 2023, the Company published a press release (the "February 2023 Press Release") announcing data from the ongoing RGX-111 Phase I/II Trial. In particular, the February 2023 Press Release announced continued positive data for the trial. Notably, the February 2023 Press Release noted that no serious adverse events occurred.

84.     Under the heading "Data Summary and Safety Data," the February 2023 Press Release stated the following:

> ***As of January 17, 2023, RGX-111 was reported to be well tolerated in the eight patients enrolled in the Phase I/II clinical trial with no drug-related serious adverse events (SAEs).*** Time of post-administration follow-up ranged from seven to 103 weeks. Two patients in Cohort 1 and three patients in Cohort 2 have completed the 48-week immunosuppression regimen, per the study protocol.[1]
>
> ***RGX-111 continued to be well-tolerated in the single-patient IND with no drug-related SAEs as of December 12, 2021.*** Time of post-administration follow-up was 87 weeks. This patient has completed the 48-week immunosuppression regimen, per the study protocol, and continues to receive weekly ERT.

85.     Moreover, under the heading "CSF Biomarker Data," the February 2023 Press Release stated:

> Data from patients in the Phase I/II trial and the single-patient IND indicate positive IDUA biomarker activity in the CNS following one-time administration of RGX-111. Heparan sulfate (HS) is a glycosaminoglycan (GAG) that is a key biomarker of IDUA enzyme activity. In the Phase I/II trial, a decrease in CSF HS was observed through the last timepoint available in the majority of patients following administration of RGX-111. Measurable CSF IDUA enzyme activity was detected after RGX-111 administration in four of the five Phase I/II trial patients and in the single patient IND participant.

86.     The February 2023 Press Release further reports positively on the neurodevelopmental data from the RGX-111 Phase I/II Trial, stating in relevant part:

---

[1] Unless otherwise stated, all emphasis is added.

Patients in the Phase I/II trial and the single-patient IND demonstrated encouraging continued neurodevelopmental skill acquisition, as measured by age and developmentally appropriate validated instruments for neurodevelopmental testing, including the Bayley Scales of Infant Development (BSID-III) for chronological or developmental ages 0-42 months, Wechsler Abbreviated Scale of Intelligence (WASI-II) for chronological and developmental age greater than six years, and the Vineland Adaptive Behavior Scale (VABS-III; across all age groups).

All five patients assessed with BSID-III demonstrated continued developmental skill acquisition on all subsets (cognition, expressive language and fine motor). At the last assessment, four of the five patients had function $\geq$ -2 standard deviations of the normative mean on the cognition, expressive language and fine motor subtests. Cognitive function in a Phase I/II trial patient and the single IND patient was higher than the age equivalent scores in the available natural history data.

87.     Moreover, Defendant Mills is quoted in the February 2023 Press Release. In particular, Defendant Mills' statement emphasizes his confidence in RGX-111 Phase I/II Trial and in RGX-111 as a clinical product candidate, stating in relevant part:

> **RGX-111 is our second-most advanced clinical candidate in our neurodegenerative disease pipeline and is part of our '5x'25' strategy to have five gene therapies either on the market or in late-stage development by 2025. We are encouraged to see that this potential one-time gene therapy using our NAV AAV9 vector continues to demonstrate compelling evidence of CNS biomarker activity.** In connecting with MPS I families, we understand the need for new treatment options that can impact daily living, and we're pleased to see that most patients in this trial demonstrated continued skill acquisition across multiple neurodevelopmental assessments.

### February 28, 2023 Earnings Call

88.     On February 28, 2023, the Company held an earnings call to discuss its financial results for the fiscal quarter and full year ended on December 31, 2022 ("Q4 2022 Earnings Call").

89.     During the Q4 2022 Earnings Call, Defendant Pakola highlighted the positive results from the RGX-111 Phase I/II Trial that were presented at the 19th Annual World*Symposium*™ stating:

> **At World, we also shared additional positive interim data from the Phase I/II trial of RGX-111 for the treatment of severe MPS I. As of January 17, 2023, RGX-111 was reported to be well tolerated, with no drug-related serious adverse events.**

Patients demonstrated positive IDUA biomarker activity in the CNS and encouraging continued neurodevelopmental skill acquisition as measured by age and developmentally appropriate validated instruments for neurodevelopmental testing.

### April 6, 2023 Proxy Statement

90.    On April 6, 2023, the Company filed a Schedule 14A with the SEC ("2023 Proxy Statement"). Defendants Mills, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary solicited the 2023 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

91.    The 2023 Proxy Statement called for the Company's shareholders to vote, *inter alia*, to: (1) re-elect Defendants Bennet, Karabelas, and Tassé to the Board; (2) ratify the selection of PricewaterhouseCoopers LLP ("PwC") as the Company's independent registered accounting firm for the year ended on December 31, 2023; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

92.    The 2023 Proxy Statement, under the heading "Risk Oversight," addresses the Board's responsibility for the oversight of the Company's risk management process, stating:

> The Board has responsibility for the oversight of the Company's risk management processes and, either as a whole or through its committees, regularly discusses with management our major risk exposures, their potential impact on our business and the steps we take to manage them. The risk oversight process includes the Board receiving regular reports from Board committees and members of senior management to enable the Board to understand and evaluate the Company's risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, strategic, reputational, information and cyber security, human capital, environmental and social risk, as well as risks relating to the COVID-19 pandemic. The oversight of risk within the Company is an evolving process requiring the Company to continually look for opportunities to further embed systematic enterprise risk management into ongoing business processes within the Company.
>
> The Board is responsible for overseeing information security risk, and management reports to the Board regarding our assessment of information security risk, among other risks we face, on a periodic basis. Management monitors our information

security systems to identify and mitigate any related risks, and we do not believe we have experienced any material cyber breaches. We maintain cybersecurity insurance coverage and we continue to invest in data protection and information technology, including providing an information security training and compliance program to our employees. Periodically, the Audit Committee reviews our policies with respect to risk assessment, risk management, loss prevention and regulatory compliance. The Audit Committee reviews information regarding liquidity and operations, and oversees our management of financial risks. Oversight by the Audit Committee includes direct communication with our external auditor, and discussions with management regarding significant risk exposures and the actions management has taken to limit, monitor or control such exposures. The Compensation Committee is responsible for assessing whether any of our compensation policies or programs has the potential to encourage excessive risk-taking and conducts a compensation risk assessment on an annual basis. The Nominating and Corporate Governance Committee manages risks associated with the independence of the Board, corporate governance practices, and potential conflicts of interest. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks. Matters of significant strategic risk are considered by the Board as a whole.

93.     Regarding the Company's "Code of Business Conduct and Ethics," the 2023 Proxy

Statement provided the following:

We maintain a code of business conduct and ethics that qualifies as a "code of ethics" under Item 406 of the Securities and Exchange Commission's (the "SEC") Regulation S-K and applies to each of our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions. The code of business conduct and ethics addresses various topics, including: (1) compliance with applicable laws, rules and regulations; (2) conflicts of interest; (3) public disclosure of information; (4) insider trading; (5) corporate opportunities; (6) competition and fair dealing; (7) gifts; (8) discrimination, harassment and retaliation; (9) health and safety; (10) record keeping; (11) confidentiality; (12) protection and proper use of company assets; (13) prevention of corruption; and (14) the reporting of illegal and unethical behavior.

The code of business conduct and ethics is available in the corporate governance section of our website at www.regenxbio.com. Any amendment or waiver of the "code of ethics" provisions of the code of business conduct and ethics for an executive officer or director may be granted only by the Board or a committee thereof and must be timely disclosed as required by applicable law. We intend to satisfy the disclosure requirements regarding any such amendment or waiver applicable to any principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, in a

35

current report filed with the SEC on Form 8-K or on our website at www.regenxbio.com.

94.     Regarding the Company's Audit Committee, the 2023 Proxy Statement stated the Audit Committee's functions include, among other things, the following:

> 1. appointing, approving the compensation of, and assessing the independence of our registered public accounting firm;
>
> 2. overseeing the work of our registered public accounting firm, including through the receipt and consideration of reports from such firm;
>
> 3. reviewing and discussing with management and the registered public accounting firm our annual and quarterly financial statements and related disclosures;
>
> 4. monitoring our internal control over financial reporting and our disclosure controls and procedures;
>
> 5. meeting independently with our registered public accounting firm and management;
>
> 6. furnishing the Audit Committee Report required by SEC rules;
>
> 7. reviewing and approving or ratifying any related person transactions; and
>
> 8. overseeing our risk assessment and risk management policies.

95.     Defendants Mills, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: *inter alia*: (1) the safety risks associated with the RGX-111 Phase I/II Trial were higher than originally stated; (2) that the interim results of the RGX-111 Phase I/II Trial were insufficient to maintain the FDA's Fast Track designation that was granted to RGX-111 in 2018; and (3) the clinical and commercial prospects of RGX-111 and the Individual Defendants' characterization of RGX-111 as one of the Company's lead clinical-stage AAV therapeutic product candidates were overstated. As a result of the foregoing, the Company's public statements

were materially false and misleading and/or lacked a reasonable basis at all relevant times.

96.     The 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company its officers and directors adhered to its Code of Conduct, the Individual Defendants violated these policies without waivers or without such waivers being disclosed and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committee's oversight functions, the Board and its committees were not adequately exercising these functions and were cause or permitting the Company to issue false and misleading statements. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

97.     As a result of Defendant Mills, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary cause the 2023 Proxy Statement to be false and misleading, the Company's shareholders voted, *inter alia*, to: (1) re-elect Defendants Bennett, Karabelas, and Tassé to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection of PwC as the Company's independent registered public accounting firm for the year ended on December 31, 2023; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

### *May 3, 2023 Press Release and Earnings Call*

98.     On May 3, 2023, the Company published a press release announcing it financial results for the period ended on March 31, 2023 ("Q1 2023 Press Release"). The Q1 2023 Press Release highlighted the positive data and progress from the RGX-111 Phase I/II Trial.

99.     In particular, the Q1 2023 Press Release reported the following, in relevant part:

• A Phase I/II trial of RGX-111 for the treatment of MPS I is fully enrolled with follow-up ongoing.

• ***REGENXBIO has recently completed the manufacture of***

37

*commercial-scale cGMP material using the NAVXpress platform process at the REGENXBIO Manufacturing Innovation Center to support the continued development of RGX-111.*

• In February 2023, REGENXBIO announced additional positive interim data from the Phase I/II trial demonstrating that RGX-111 was well tolerated in eight patients. Biomarker and neurodevelopmental assessments indicated an encouraging CNS profile in patients dosed with RGX-111.

• *REGENXBIO expects to complete analytical characterization of the commercial-scale cGMP [Good Manufacturing Practices] material and share additional updates on program plans in the second half of 2023.*

100.    On the same day, the Company held an earnings call to discuss its financial results for the period ended on March 31, 2023 ("Q1 2023 Earnings Call").

101.    During the Q1 2023 Earnings Call, Defendant Pakola again highlighted the positive results of the RGX-111 Phase I/II Trial that were presented at the 19th Annual World *Symposium*. Specifically, Defendant Pakola stated the following:

Moving to RGX-111, an investigational onetime AAV therapeutic for the treatment of severe MPS I using the NAV AAV9 vector to deliver the IDUA gene. We have completed enrollment of the Phase I/II trial of RGX-111 for the treatment of MPS I and plan to use commercial-scale cGMP material being manufactured at our Manufacturing Innovation Center using the NAVXpress platform process to support its continued development.

*We recently announced additional positive interim data from the Phase I/II trial at the 2023 WORLDSymposium in February, demonstrating that RGX-111 was well tolerated in 8 patients. Biomarker and neurodevelopmental assessments indicated an encouraging CNS profile in patients dosed with RGX-111.* We expect to share additional updates on plans for this program in the second half of 2023.

***November 8, 2023 Press Release and Earnings Call***

102.    On November 8, 2023, the Company published a press release announcing its financial results for the period ended on September 30, 2023 ("Q3 2023 Press Release").

103.    In particular, the Q3 2023 Press Release, under the heading "Pipeline Prioritization and Corporate Restructuring," stated the following:

The following key strategic decisions support the pipeline prioritization and corporate restructuring related to product candidates that are differentiated, can be expedited, and support near-term and long-term value generation.

***

- Pursuing strategic alternatives, including potential partnering, for its other rare neurodegenerative disease clinical stage programs: RGX-111 for the treatment of severe Mucopolysaccharidosis Type I, RGX-181 for the treatment of late-infantile neuronal ceroid lipofuscinosis type 2 (CLN2) disease, a form of Batten disease and RGX-381 for the treatment of the ocular manifestations of CLN2 disease

104. On the same day, the Company held an earnings call to discuss its financial results for the period ended on September 30, 2023 ("Q3 2023 Earnings Call").

105. During the Q3 2023 Earnings Call, Defendant Pakola and Defendant Mills touched on the Company's decision to deprioritize the RGX-111 Phase I/II Trial. In this regard, Defendant Pakola stated the following:

> While we are no longer moving forward with our RGX-111, 181 and 381 rare neurodegenerative programs, *we believe in the potential of these therapies and are committed to finding strategic alternatives for them, including potential partners or leveraging public private partnerships.*

106. Defendant Mills further added that:

> So with respect to 111 and other things, that's going to be a discontinuation of any clinical development work and exercise that will result in looking for opportunities in the short term for partnering, but it won't become something that will be viewed as a meaningful contribution to the operating plans going forward.

### April 4, 2024, Proxy Statement

107. On April 4, 2024, the Company filed a Schedule 14A with the SEC ("2024 Proxy Statement"). Defendants Mills, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

108. The 2024 Proxy Statement called for the Company's shareholders to vote, *inter alia*, to: (1) re-elect Defendants Migausky, Mills, and Stump to the Board; (2) ratify the selection

39

of PwC as the Company's independent registered accounting firm for the year ended on December 31, 2024; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

109.    Regarding "Risk Oversight," the 2024 Proxy statement provided the following:

The Board has responsibility for the oversight of the Company's risk management processes and, either as a whole or through its committees, regularly discusses with management our major risk exposures, their potential impact on our business and the steps we take to manage them. The risk oversight process includes the Board receiving regular reports from Board committees and members of senior management to enable the Board to understand and evaluate the Company's risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, strategic, reputational, information and cyber security, human capital, environmental and social risk. The oversight of risk within the Company is an evolving process requiring the Company to continually look for opportunities to further embed systematic enterprise risk management into ongoing business processes within the Company.

The Board is responsible for overseeing information security risk, and management reports to the Board regarding our assessment of information security risk, among other risks we face, on a periodic basis. Management monitors our information security systems to identify and mitigate any related risks, and we do not believe we have experienced any material cyber breaches. We maintain cybersecurity insurance coverage and we continue to invest in data protection and information technology, including providing an information security training and compliance program to our employees. Periodically, the Audit Committee reviews our policies with respect to risk assessment, risk management, loss prevention and regulatory compliance. The Audit Committee reviews information regarding liquidity and operations, and oversees our management of financial risks. Oversight by the Audit Committee includes direct communication with our external auditor, and discussions with management regarding significant risk exposures and the actions management has taken to limit, monitor or control such exposures. The Compensation Committee is responsible for assessing whether any of our compensation policies or programs has the potential to encourage excessive risk-taking and conducts a compensation risk assessment on an annual basis. The Nominating and Corporate Governance Committee manages risks associated with the independence of the Board, corporate governance practices, and potential conflicts of interest. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks. Matters of significant strategic risk are considered by the Board as a whole.

110.    Regarding the Company's Code of Conduct, the 2024 Proxy Statement states the following:

We maintain a code of business conduct and ethics that qualifies as a "code of ethics" under Item 406 of the Securities and Exchange Commission's (the "SEC") Regulation S-K and applies to each of our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions. The code of business conduct and ethics addresses various topics, including: (1) compliance with applicable laws, rules and regulations; (2) conflicts of interest; (3) public disclosure of information; (4) insider trading; (5) corporate opportunities; (6) competition and fair dealing; (7) gifts; (8) discrimination, harassment and retaliation; (9) health and safety; (10) record keeping; (11) confidentiality; (12) protection and proper use of company assets; (13) prevention of corruption; and (14) the reporting of illegal and unethical behavior.

The code of business conduct and ethics is available in the corporate governance section of our website at www.regenxbio.com. Any amendment or waiver of the "code of ethics" provisions of the code of business conduct and ethics for an executive officer or director may be granted only by the Board or a committee thereof and must be timely disclosed as required by applicable law. We intend to satisfy the disclosure requirements regarding any such amendment or waiver applicable to any principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, in a current report filed with the SEC on Form 8-K or on our website at www.regenxbio.com.

111.    Regarding the Company's Audit Committee, the 2024 Proxy Statement states that the Audit Committee is responsible for the following functions:

1. appointing, approving the compensation of, and assessing the independence of our registered public accounting firm;

2. overseeing the work of our registered public accounting firm, including through the receipt and consideration of reports from such firm;

3. reviewing and discussing with management and the registered public accounting firm our annual and quarterly financial statements and related disclosures;

4. monitoring our internal control over financial reporting and our disclosure controls and procedures;

5. meeting independently with our registered public accounting firm and

41

management;

      6. furnishing the Audit Committee Report required by SEC rules;

      7. reviewing and approving or ratifying any related person transactions; and

      8. overseeing our risk assessment and risk management policies.

112. Defendants Mills, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, (1) the safety risks associated with the RGX-111 Phase I/II Trial were higher than originally stated; (2) that the interim results of the RGX-111 Phase I/II Trial were insufficient to maintain the FDA's Fast Track designation that was granted to RGX-111 in 2018; and (3) the clinical and commercial prospects of RGX-111 and the Individual Defendants' characterization of RGX-111 as one of the Company's lead clinical-stage AAV therapeutic product candidates were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

113. The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to its Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

114. As a result of Defendant Mills, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary causing the 2024 Proxy Statement to be false and misleading, the Company's shareholders voted, *inter alia*, to: (1) re-elect Defendants Migausky, Mills, and Stump to the Board, thereby allowing them to continue breach their fiduciary duties to the Company; (2)

ratify the selection of PwC as the Company's independent registered accounting firm for the year ended on December 31,2024; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

### January 14, 2025, Press Release

115. On January 14, 2025, the Company published a press release (the "January 2025 Press Release") announcing its partnership with Nippon Shinyaku Co., Ltd. for the "development and commercialization of . . . RGX-111 for Mucopolysaccharidosis I (MPS I)."

116. The January 2025 Press Release also emphasized that "[p]ostive interim data from a Phase I/II trial of RGX-111 were reported in February 2023." Moreover, it noted that "RGX-111 has received orphan drug product rare pediatric disease and Fast Track designations from the U.S. Food and Drug Administration (FDA)."

117. Defendant Simpson is quoted in the January 2025 Press Release as stating:

This partnership with Nippon Shinyaku is exciting in that it maximizes our collective strengths and enables access of two potentially transformational medicines to key markets. The structure of the agreement allows us to leverage our expertise in gene therapy manufacturing while also capturing milestones and a meaningful share of future product revenues. RGX-121 is poised to be the first gene therapy for MPS II with potential FDA approval as early as late 2025, and ***RGX-111 has demonstrated very promising results in Phase 1/2 study. With Nippon Shinyaku's expertise in rare disease and strong commercial capabilities, we look forward to working together to get both of these promising candidates across the finish line for patients.***

118. The statements made by the Individual Defendants in ¶¶ 81-89, 98-106, and 115-117 above were materially false and misleading and failed to disclose, *inter alia*: (1) the safety risks associated with the RGX-111 Phase I/II Trial were higher than originally stated; (2) that the interim results of the RGX-111 Phase I/II Trial were insufficient to maintain the FDA's Fast Track designation that was granted to RGX-111 in 2018; and (3) the clinical and commercial prospects of RGX-111 and the Individual Defendants' characterization of RGX-111 as one of the Company's

43

lead clinical-stage AAV therapeutic product candidates were overstated. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

***April 8, 2025, Proxy Statement***

119. On April 8, 2025, Defendants Mills, Simpson, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

120. The 2025 Proxy Statement called for the Company's shareholders to vote, *inter alia*, to: (1) re-elect Defendants Fox, Glucksmann, Zachary, and Simpson to the Board; (2) ratify the selection of PwC as the Company's independent registered accounting firm for the year ended on December 31, 2025; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; (4) approve, on an advisory basis, the frequency of future stockholder advisory votes on the compensation paid to the Company's named executives; and (5) approve the Company's 2025 Equity Incentive Plan ("2025 Incentive Plan").

121. The 2025 Proxy Statement noted that if approved, the 2025 Incentive Plan would cause 5,500,000 shares to be made available under the plan, subject to increase based on shares that "shares that are subject to awards that were granted under the 2015 [Equity Incentive] Plan, are still outstanding on the effective date of the 2025 Plan, and are later forfeited, expire, terminate, or are canceled without the delivery of all shares subject to the award." The 2025 Proxy Statement stated that employees, outside directors, and consultants are eligible to participate in the 2025 Incentive Plan. It further notes that if the 2025 Incentive Plan is not approved, the Company "will no longer have the ability to grant equity compensation to its employees and directors after June 17, 2025, which is the expiration of the 2015 [Equity Incentive] Plan."

122.    Moreover, regarding "Risk Oversight," the 2025 Proxy Statement provided the following:

The Board has responsibility for the oversight of the Company's risk management processes and, either as a whole or through its committees, regularly discusses with management our major risk exposures, their potential impact on our business and the steps we take to manage them. The risk oversight process includes the Board receiving regular reports from Board committees and members of senior management to enable the Board to understand and evaluate the Company's risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, strategic, reputational, information and cyber security, human capital, environmental and social risk. The oversight of risk within the Company is an evolving process requiring the Company to continually look for opportunities to further embed systematic enterprise risk management into ongoing business processes within the Company.

The Board is responsible for overseeing information security risk, and management reports to the Board regarding our assessment of information security risk, among other risks we face, on a periodic basis. Management monitors our information security systems to identify and mitigate any related risks, and we do not believe we have experienced any material cyber breaches. We maintain cybersecurity insurance coverage and we continue to invest in data protection and information technology, including providing an information security training and compliance program to our employees. Periodically, the Audit Committee reviews our policies with respect to risk assessment, risk management, loss prevention and regulatory compliance. The Audit Committee reviews information regarding liquidity and operations, and oversees our management of financial risks. Oversight by the Audit Committee includes direct communication with our external auditor, and discussions with management regarding significant risk exposures and the actions management has taken to limit, monitor or control such exposures. The Compensation Committee is responsible for assessing whether any of our compensation policies or programs has the potential to encourage excessive risk-taking and conducts a compensation risk assessment on an annual basis. The Nominating and Corporate Governance Committee manages risks associated with the independence of the Board, corporate governance practices, and potential conflicts of interest. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks. Matters of significant strategic risk are considered by the Board as a whole.

123.    Regarding the Company's Code of Conduct, the 2025 Proxy Statement states the following:

We maintain a code of business conduct and ethics that qualifies as a "code of ethics" under Item 406 of the Securities and Exchange Commission's (the "SEC") Regulation S-K and applies to each of our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions. The code of business conduct and ethics addresses various topics, including: (1) compliance with applicable laws, rules and regulations; (2) conflicts of interest; (3) public disclosure of information; (4) insider trading; (5) corporate opportunities; (6) competition and fair dealing; (7) gifts; (8) discrimination, harassment and retaliation; (9) health and safety; (10) record keeping; (11) confidentiality; (12) protection and proper use of company assets; (13) prevention of corruption; and (14) the reporting of illegal and unethical behavior.

The code of business conduct and ethics is available in the corporate governance section of our website at www.regenxbio.com. Any amendment or waiver of the "code of ethics" provisions of the code of business conduct and ethics for an executive officer or director may be granted only by the Board or a committee thereof and must be timely disclosed as required by applicable law. We intend to satisfy the disclosure requirements regarding any such amendment or waiver applicable to any principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, in a current report filed with the SEC on Form 8-K or on our website at www.regenxbio.com.

124. Regarding the Company's Audit Committee, the 2025 Proxy Statement states that the Audit Committee is responsible for the following functions:

1. appointing, approving the compensation of, and assessing the independence of our registered public accounting firm;

2. overseeing the work of our registered public accounting firm, including through the receipt and consideration of reports from such firm;

3. reviewing and discussing with management and the registered public accounting firm our annual and quarterly financial statements and related disclosures;

4. monitoring our internal control over financial reporting and our disclosure controls and procedures;

5. meeting independently with our registered public accounting firm and management;

6. furnishing the Audit Committee Report required by SEC rules;

46

7. reviewing and approving or ratifying any related person transactions; and

8. overseeing our risk assessment and risk management policies.

125. Defendants Mills, Simpson, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*: (1) the safety risks associated with the RGX-111 Phase I/II Trial were higher than originally stated; (2) that the interim results of the RGX-111 Phase I/II Trial were insufficient to maintain the FDA's Fast Track designation that was granted to RGX-111 in 2018; and (3) the clinical and commercial prospects of RGX-111 and the Individual Defendants' characterization of RGX-111 as one of the Company's lead clinical-stage AAV therapeutic product candidates were overstated. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

126. The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to its Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

127. As a result of Defendant Mills, Simpson, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary causing the 2025 Proxy Statement to be false and misleading, the Company's shareholders voted, *inter alia*, to: (1) re-elect Defendants Fox, Glucksmann, Zachary, and Simpson to the Board, thereby allowing them to breach and continue breach their fiduciary duties to the Company; (2) ratify the selection of PwC as the Company's independent registered accounting firm for the year ended on December 31, 2025; (3) approve, on

an advisory basis, the compensation of the Company's named executive officers; (4) approve, on an advisory basis, to hold future advisory votes on the Company's executive compensation annually; and (5) approve the Company's 2025 Incentive Plan.

128.  As a result of shareholders approving the 2025 Incentive Plan, the plan was effective immediately upon reaching shareholder approval on May 30, 2025. 5,500,000 shares were made available for grant under the 2025 Incentive Plan. The Individual Defendants, many of whom are directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2025 Proxy Statement and the shareholders approval of the 2025 Incentive Plan. Moreover, certain Individual Defendants continue to receive and will continue to receive material personal benefits in the form of stock awards under the 2025 Incentive Plan in the future.

## THE TRUTH EMERGES

### *January 28, 2026, Press Release*

129.  On January 28, 2026, the Company published a press release (the "January 2026 Press Release") announcing that the FDA had placed a clinical hold on its investigational gene therapy RGX-111. Contrary to the Individual Defendants repeated assurances that no adverse events were observed resulting from the Phase I/II RGX-111 trial, this hold came after the preliminary genetic analysis of neoplasm was identified in a Phase I RGX-111 trial participant.

130.  The FDA also placed a clinical hold on the Company's other product candidate, RGX-121, referencing the "similarities in products, study populations, and shared risk between the clinical studies."

131.  Moreover, the January 2026 Press Release stated the following:

The case was identified during a routine brain MRI of an asymptomatic five-year-old participant who received intracisternal RGX-111 four years prior. Preliminary

genetic analysis of the resected tumor detected an AAV vector genome integration event associated with overexpression of a proto-oncogene (PLAG1), which is known to be susceptible to chromosomal rearrangements. The investigation to determine if this SAE is drug related is ongoing. The causality has not been established. The participant continues to be asymptomatic, with positive developmental advancements noted by the treating physician. No evidence of neoplasm has been reported in the nine other participants treated with RGX-111 nor in the 32 participants treated with RGX-121.

132.    On this news, the price of the Company's Common stock dropped $2.40, or about 17.8%, from a closing price of $13.41 per share on January 28, 2026, to a closing price of $11.01 per share on January 29, 2026.

## DAMAGES TO REGENXBIO

133.    As a direct and proximate result of the Individual Defendants' conduct, REGENXBIO will lose and expend many millions of dollars.

134.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its former CEO, its CEO, and its CMO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

135.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

136.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, including payments of any fines or settlement amounts associated with the Company's violations.

137.    Additionally, these expenditures include, but are not limited to, excessive

49

compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including amounts received pursuant to the 2025 Incentive Plan.

138.    As a direct and proximate result of the Individual Defendants' conduct, REGENXBIO has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

139.    Plaintiff brings this action derivatively and for the benefit of REGENXBIO to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of REGENXBIO, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

140.    REGENXBIO is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

141.    Plaintiff is, and has been at all relevant times, a shareholder of REGENXBIO. Plaintiff will adequately and fairly represent the interests of REGENXBIO in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

142.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143.    A pre-suit demand on the Board is futile and, therefore, excused. When this action

50

was filed, REGENXBIO's Board consisted of the following ten individuals: Defendants Mills, Simpson, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the ten Director-Defendants that were on the Board at the time this action was filed.

144.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

145.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted REGENXBIO to issue materially false and misleading statements. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

146.    In addition, the Director-Defendants caused the 2025 Proxy Statement to call for a shareholder vote to approve the 2025 Incentive Plan, thereby making available for issuance thereunder 5,500,000 shares. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2025 Incentive Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2025 Incentive Plan at the annual meeting of stockholders on May 30, 2025, the 2015 Equity Incentive Plan was set to expire . For this reason, the Individual Defendants, including the Director-Defendants, received

material personal benefits that they otherwise would not receive but for the issuance of the 2025 Proxy Statement and the shareholders' approval of the 2025 Incentive Plan that made 5,500,000 shares available thereunder. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

147.    Additional reasons that demand on Defendant Mills is futile follow. Defendant Mills has served a Company director since March 2009 and as Chairman of the Board since July 2024. Prior to his appointment as Chairman of the Board, Defendant Mills served as the Company's CEO and President from September 2015 to July 2024. As the Company admits, Defendant Mills is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, Defendant Mills failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Mills solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election Defendants Bennett, Karabelas, and Tassé, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Mills solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election of himself and Defendants Migausky and Stump, thereby allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Mills also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Fox, Glucksmann, Zachary, and Simpson, thereby allowing them to continue to breach their fiduciary duties to the Company,

and the approval of the 2025 Incentive Plan. Under the 2025 Incentive Plan, Defendant Mills is eligible to receive stock awards under the 2025 Incentive Plan, thereby materially benefiting from the adoption of the 2025 Incentive Plan. Moreover, Defendant Mills' insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the scheme. Defendant Mills was also named as a defendant in the Securities Class Action. For these reasons, Defendant Mills breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

148.    Additional reasons that demand on Defendant Simpson is futile follow. Defendant Simpson has served as a Company director and as the Company's President and CEO since July 2024. Prior to his current role, Defendant Simpson served as the Company's EVP, Chief Operating Officer, and has been a part of the Company's Senior Management since August 2015. As such, the Company provides Defendant Simpson with his principal occupation for which he has received and continues to receive lucrative compensation. Thus, as the Company admits, Defendant Simpson is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, Defendant Simpson failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Simpson also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Fox, Glucksmann, and Zachary, thereby allowing them to continue to breach their fiduciary duties to the Company,

and the approval of the 2025 Incentive Plan. Under the 2025 Incentive Plan, Defendant Simpson is eligible to receive stock awards under the 2025 Incentive Plan, thereby materially benefiting from the adoption of the 2025 Incentive Plan. Moreover, Defendant Simpson's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the scheme. Defendant Simpson is also named as a defendant in the Securities Class Action. For these reasons, Defendant Simpson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

149.    Additional reasons demand on Defendant Bennett is futile follow. Defendant Bennett has served as Company director since September 2021 and serves on the Compensation Committee. Defendant Bennett has received and continues to receive sizable compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, Defendant Bennett failed to correct the false and misleading statements alleged herein. Defendant Bennett also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election of herself and Defendants Karabelas, and Tassé, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Bennett further solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election of Defendants Mills, Migausky, and Stump, thereby allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Bennett also solicited the 2025 Proxy Statement, which

contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Fox, Glucksmann, Zachary, and Simpson, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Incentive Plan. Under the 2025 Incentive Plan, Defendant Bennett is eligible to receive stock awards under the 2025 Incentive Plan, thereby materially benefiting from the adoption of the 2025 Incentive Plan. For these reasons, Defendant Bennett breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

150.    Additional reasons that demand on Defendant Fox is futile follow. Defendant Fox has served as a Company director since February 2009 and previously served as Chairman of the Board from June 2020 to June 2024. Defendant Fox has received and continues to receive sizable compensation for his role as a director. Moreover, Defendant Fox, through his position as founding partner of FOXKISER, a firm committed to the development of innovations in biomedical research, participated in the founding of REGENXBIO. As the Company admits, Defendant Fox is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, Defendant Fox failed to correct the false and misleading statements alleged herein. Defendant Fox also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election Defendants Bennett, Karabelas, and Tassé, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Fox further solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election Defendants Mills,

Migausky, and Stump, thereby allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Fox solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Glucksmann, Simpson, and Zachary, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Incentive Plan. Under the 2025 Incentive Plan, Defendant Fox is eligible to receive stock awards under the 2025 Incentive Plan, thereby materially benefiting from the adoption of the 2025 Incentive Plan. For these reasons, Defendant Fox breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

151.    Additional reasons demand on Defendant Glucksmann is futile follow. Defendant Glucksmann has served as a Company director since May 2018 and serves on the Compensation Committee. Defendant Glucksmann has received and continues to receive sizable compensation for her role as a director. As a trusted Company director, she has conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, Defendant Glucksmann failed to correct the false and misleading statements alleged herein. Defendant Glucksmann also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election Defendants Bennet, Karabelas, and Tassé, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Glucksmann further solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election Defendants Mills, Migausky, and Stump, thereby allowing them to continue to breach their fiduciary duties to the

Company. Furthermore, Defendant Glucksmann solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and Defendants Fox, Zachary, and Simpson, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Incentive Plan. Under the 2025 Incentive Plan, Defendant Glucksmann is eligible to receive stock awards under the 2025 Incentive Plan, thereby materially benefiting from the adoption of the 2025 Incentive Plan. For these reasons, Defendant Glucksmann breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

152.    Additional reasons demand on Defendant Karabelas is futile follow. Defendant Karabelas has served as a Company director since May 2015 and serves on the Compensation Committee. Defendant Karabelas has received and continues to receive sizable compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, Defendant Karabelas failed to correct the false and misleading statements alleged herein. Defendant Karabelas also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election of himself and Defendants Bennett and Tassé, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Karabelas further solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election Defendants Mills, Migausky, and Stump, thereby allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Karabelas also solicited the 2025 Proxy Statement, which

contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Fox, Glucksmann, Zachary, and Simpson, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Incentive Plan. Under the 2025 Incentive Plan, Defendant Karabelas is eligible to receive stock awards under the 2025 Incentive Plan, thereby materially benefiting from the adoption of the 2025 Incentive Plan. Moreover, Defendant Karabelas' insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Karabelas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

153.    Additional reasons demand on Defendant Migausky is futile follow. Defendant Migausky has served as a Company director since September 2021 and also serves as the Chair of the Audit Committee. Defendant Migausky has received and continues to receive sizable compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, Defendant Migausky failed to correct the false and misleading statements alleged herein. Defendant Migausky also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election of Defendant Karabelas, Bennett, and Tassé, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Migausky further solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election of himself and

58

Defendants Mills and Stump, thereby allowing them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant Migausky also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Fox, Glucksmann, Zachary, and Simpson, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Incentive Plan. Under the 2025 Incentive Plan, Defendant Migausky is eligible to receive stock awards under the 2025 Incentive Plan, thereby materially benefiting from the adoption of the 2025 Incentive Plan. For these reasons, Defendant Migausky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

154. Additional reasons demand on Defendant Stump is futile follow. Defendant Stump has served as a Company director since October 2015. He also serves on the Audit Committee and as the Chair of the Nominating and Corporate Governance Committee. Defendant Stump has received and continues to receive sizable compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, Defendant Stump failed to correct the false and misleading statements alleged herein. Defendant Stump also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election of Defendant Karabelas, Bennet, and Tassé, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Stump further solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election of himself and Defendants Mills and Migausky, thereby allowing them to continue to

breach their fiduciary duties to the Company. Furthermore, Defendant Stump also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Fox, Glucksmann, Zachary, and Simpson, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Incentive Plan. Under the 2025 Incentive Plan, Defendant Stump is eligible to receive stock awards under the 2025 Incentive Plan, thereby materially benefiting from the adoption of the 2025 Incentive Plan. For these reasons, Defendant Stump breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

155.    Additional reasons demand on Defendant Tassé is futile follow. Defendant Tassé has served as a Company director since August 2016 and as the Company's Lead Independent Director since July 2024. He also serves as Chair of the Compensation Committee. Defendant Tassé has received and continues to receive sizable compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, Defendant Tassé failed to correct the false and misleading statements alleged herein. Defendant Tassé also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election of himself and Defendant Karabelas and Bennett, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Tassé further solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election of Defendants Mills, Stump, and Migausky, thereby allowing them to

continue to breach their fiduciary duties to the Company. Furthermore, Defendant Tassé also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Fox, Glucksmann, Zachary, and Simpson, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Incentive Plan. Under the 2025 Incentive Plan, Defendant Tassé is eligible to receive stock awards under the 2025 Incentive Plan, thereby materially benefiting from the adoption of the 2025 Incentive Plan. For these reasons, Defendant Tassé breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore excused.

156.    Additional reasons demand on Defendant Zachary is futile follow. Defendant Zachary has served as a Company director since June 2022 and serves on the Audit Committee. Defendant Zachary has received and continues to receive sizable compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, Defendant Zachary failed to correct the false and misleading statements alleged herein. Defendant Zachary also solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election of Defendants Tassé, Karabelas, and Bennett, thereby allowing them to continue to breach their fiduciary duties to the Company. Defendant Zachary further solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions resulting in, *inter alia*, the re-election of Defendants Mills, Stump, and Migausky, thereby allowing them to continue to breach their fiduciary duties to the Company. Furthermore,

61

Defendant Zachary also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and Defendants Fox, Glucksmann, and Simpson, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Incentive Plan. Under the 2025 Incentive Plan, Defendant Zachary is eligible to receive stock awards under the 2025 Incentive Plan, thereby materially benefiting from the adoption of the 2025 Incentive Plan. For these reasons, Defendant Zachary breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore excused.

157.    Additional reasons that demand on the Board is futile follow.

158.    Defendants Migausky (as Chair), Stump, and Zachary (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

159.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the schemes to cause the Company to issue materially false and misleading statements

to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity; failing to avoid conflicts of interest; failing to ensure the Company's disclosures were accurate; failing to ensure the Company complied with applicable laws, rules, and regulations; and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

160.    REGENXBIO has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for REGENXBIO any part of the damages REGENXBIO suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

161.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

162.    The acts complained of herein constitute violations of fiduciary duties owed by REGENXBIO's officers and directors, and these acts are incapable of ratification.

163. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of REGENXBIO. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of REGENXBIO, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

164. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause REGENXBIO to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

165. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against Defendants Mills, Simpson, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary for Violations of Section 14(a) of the Exchange Act**

166. Plaintiff incorporates by reference and realleges each and every allegation set forth

64

above, as though fully set forth herein.

167.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

168.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

169.    Under the direction and watch of Defendants Mills, Simpson, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary caused the 2023, 2024, and 2025 Proxy Statements to be false and misleading by failing to disclose, *inter alia*: (1) the safety risks associated with the RGX-111 Phase I/II Trial were higher than originally stated; (2) that the interim results of the RGX-111 Phase I/II Trial were insufficient to maintain the FDA's Fast Track designation that was granted to RGX-111 in 2018; and (3) the clinical and commercial prospects of RGX-111 and the Individual Defendants' characterization of RGX-111 as one of the Company's lead clinical-stage AAV therapeutic product candidates were overstated. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

170.    Under the direction and watch of Defendants Mills, Simpson, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary, the 2023, 2024, and 2025 Proxy Statements also failed to disclose that: *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the  2023, 2024, and 2025 Proxy Statements' description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

171.    In the exercise of reasonable care, Defendants Mills, Simpson, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023, 2024, and 2025 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2023, 2024, and 2025 Proxy Statement, including, but not limited to, the re-election of directors and approval of the 2025 Incentive Plan.

172.    As a result of Defendants Mills, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary causing the 2023 Proxy Statement to be false and misleading, the Company's shareholders voted, *inter alia*, to: (1) re-elect Defendants Bennett, Karabelas, and Tassé to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection of PwC as the Company's independent registered public accounting firm for the year ended on December 31, 2023; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

173.    As a result of Defendant Mills, Bennett, Fox, Glucksmann, Karabelas, Migausky,

Stump, Tassé, and Zachary causing the 2024 Proxy Statement to be false and misleading, the Company's shareholders voted, *inter alia*, to: (1) re-elect Defendants Migausky, Mills, and Stump to the Board, thereby allowing them to continue breach their fiduciary duties to the Company; (2) ratify the selection of PwC as the Company's independent registered accounting firm for the year ended on December 31,2024; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

174.    As a result of Defendant Mills, Simpson, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary causing the 2025 Proxy Statement to be false and misleading, the Company's shareholders voted, *inter alia*, to: (1) re-elect Defendants Fox, Glucksmann, Zachary, and Simpson to the Board, thereby allowing them to breach and continue breach their fiduciary duties to the Company; (2) ratify the selection of PwC as the Company's independent registered accounting firm for the year ended on December 31, 2025; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; (4) approve, on an advisory basis, to hold future advisory votes on the Company's executive compensation annually; and (5) approve the Company's 2025 Incentive Plan, which allowed for 5,500,000 shares available for grant.

175.    The Company was damaged as a result of Defendant Mills, Simpson, Bennett, Fox, Glucksmann, Karabelas, Migausky, Stump, Tassé, and Zachary's material misrepresentations and omissions in the 2023, 2024, and 2025 Proxy Statements.

176.    Plaintiff, on behalf of REGENXBIO, has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

177.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

178.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of REGENXBIO's business and affairs.

179.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

180.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of REGENXBIO.

181.    In breach of their fiduciary duties owed to REGENXBIO, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*: (1) the safety risks associated with the RGX-111 Phase I/II Trial were higher than originally stated; (2) that the interim results of the RGX-111 Phase I/II Trial were insufficient to maintain the FDA's Fast Track designation that was granted to RGX-111 in 2018; and (3) the clinical and commercial prospects of RGX-111 and the Individual Defendants' characterization of RGX-111 as one of the Company's lead clinical-stage AAV therapeutic product candidates were overstated. As a result, the Individual Defendants' statements during the Relevant Period were materially false and misleading at all relevant times.

182.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

183.    Also, in breach of their fiduciary duties, the Individual Defendants failed to

maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

184.    In yet further breach of their fiduciary duties, during the Relevant Period, while the Company's common stock was at artificially inflated prices before the fraud was exposed, four of the Individual Defendants engaged in lucrative insider sales, netting combined total proceeds of approximately $7.7 million.

185.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

186.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

187.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, REGENXBIO has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

188.    Plaintiff, on behalf of REGENXBIO, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

69

189. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

190. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, REGENXBIO.

191. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from REGENXBIO that was tied to the performance or artificially inflated valuation of REGENXBIO or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

192. Plaintiff, as a shareholder and representative of REGENXBIO, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

193. Plaintiff, on behalf of REGENXBIO, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

194. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

195. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence REGENXBIO, for which they are legally responsible.

196. As a direct and proximate result of the Individual Defendants' abuse of control, REGENXBIO has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

197.     Plaintiff, on behalf of REGENXBIO, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

198.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of REGENXBIO in a manner consistent with the operations of a publicly held corporation.

200.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, REGENXBIO has sustained and will continue to sustain significant damages.

201.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

202.     Plaintiff, on behalf of REGENXBIO, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

203.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

204.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

205.     In addition, the Individual Defendants caused the Company to repurchase its own

common stock at artificially inflated prices, thereby wasting the Company's assets.

206.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

207.    Plaintiff, on behalf of REGENXBIO, has no adequate remedy at law.

### SEVENTH CLAIM
**Against Defendants Mills, Simpson, and Pakola for Contribution Under Sections 10(b) and 21D of the Exchange Act**

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.    REGENXBIO and Defendants Mills, Simpson, and Pakola are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Mills', Simpson's, and Pakola's willful and/or reckless violations of their obligations as officers and/or directors of REGENXBIO.

210.    Defendants Mills, Simpson, and Pakola, because of their positions of control and authority as officers, directors, and/or former officers of REGENXBIO, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of REGENXBIO, including the wrongful acts complained of herein and in the Securities Class Action.

211.    Accordingly, Defendants Mills, Simpson, and Pakola are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for

contribution arising out of violations of the Exchange Act.

212. As such, REGENXBIO is entitled to receive all appropriate contribution or indemnification from Defendants Mills, Simpson, and Pakola.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of REGENXBIO, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to REGENXBIO;

(c) Determining and awarding to REGENXBIO the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing REGENXBIO and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect REGENXBIO and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of REGENXBIO to nominate at least

five candidates for election to the Board;

       3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

      (e)     Awarding REGENXBIO restitution from the Individual Defendants, and each of them;

      (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 13, 2026

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Roberto Medina, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of March 2026.

Signed by:

425CABD1D0B0427...

Roberto Medina